[Cite as *State v. Brown*, 2017-Ohio-2633.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No. 28241 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JEFFERY BROWN | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 2015 12 3795 |

DECISION AND JOURNAL ENTRY

Dated: May 3, 2017

TEODOSIO, Judge.

{¶1} Appellant, Jeffery Brown, appeals from his conviction for aggravated robbery with a firearm specification in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} The victim took her six-month-old grandson for a walk around the neighborhood one morning when she noticed a man wearing a dark hoodie and jeans. After another walk that afternoon, the man approached her from behind in her driveway and asked for a ride to a pawn shop or for her to call him a cab. The hoodie partially covered his face and he looked down, avoiding eye contact. The victim called a cab, but the man also asked for a drink of water. She retrieved a coffee mug with water for him. He drank from the mug and then pulled out a gun and demanded her cell phone and purse.

{¶3} Officer David Haverstick had seen a man matching the suspect's description twice earlier in the day while on patrol in the victim's neighborhood. Mr. Brown was a suspect

in a nearby burglary and Lieutenant David Whiddon thought Mr. Brown matched the description of the suspect in this case. When Officer Haverstick transported Mr. Brown to the police station, he recognized him as the man he had seen twice on the day of the robbery. At a photo array, the victim was uncertain while attempting to identify the perpetrator. Mr. Brown's home was searched, but no evidence of the robbery was found. The victim's bank card and checkbook were later found by a neighbor in a grassy area next to Mr. Brown's apartment complex.

{¶4} The victim and Mr. Brown provided DNA samples through buccal swabs. DNA analysis from the Ohio Bureau of Criminal Identification and Investigation showed the victim to be a major contributor of DNA on the coffee mug and Mr. Brown to be a minor contributor. No other DNA was found on the mug. The statistical chance that a random person in the population would also have their DNA on the mug was 1 in 291.

{¶5} Mr. Brown was arrested and charged with aggravated robbery and a firearm specification. After a jury trial, he was convicted and sentenced to ten years in prison.

{¶6} Mr. Brown now appeals from his conviction and raises two assignments of error for this Court's review.

II.

**ASSIGNMENT OF ERROR ONE**

JEFFERY BROWN'S CONVICTION FOR AGGRAVATED ROBBERY WITH A FIREARM SPECIFICATION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 5TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶7} In his first assignment of error, Mr. Brown argues that there was insufficient evidence to prove his identity as the perpetrator and to prove that the firearm was operable. We disagree.

{¶8} "A sufficiency challenge of a criminal conviction presents a question of law, which we review de novo." *State v. Spear*, 9th Dist. Summit No. 28181, 2017-Ohio-169, ¶ 6, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "Sufficiency concerns the burden of production and tests whether the prosecution presented adequate evidence for the case to go to the jury." *State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 25, citing *Thompkins* at 386. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. However, "we do not resolve evidentiary conflicts or assess the credibility of witnesses, because these functions belong to the trier of fact." *State v. Hall*, 9th Dist. Summit No. 27827, 2017-Ohio-73, ¶ 10.

{¶9} Here, Mr. Brown was convicted of aggravated robbery under R.C. 2911.01(A)(1), which states, in part, that "[n]o person, in attempting or committing a theft offense * * *, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *." He was also convicted of a firearm specification under R.C. 2941.145 for "[having] a firearm on or about [his] person or under [his] control while committing the offense and display[ing] the firearm, brandish[ing] the firearm, indicat[ing] that [he] possessed the firearm, or us[ing] it to facilitate the offense."

{¶10} Because Mr. Brown only challenges his identification as the perpetrator and the operability of the firearm, we will limit our analysis to these elements.

Identity of the Perpetrator

{¶11} "The identity of a perpetrator must be proved by the State beyond a reasonable doubt." *State v. Jackson*, 9th Dist. Summit No. 28192, 2017-Ohio-635, ¶ 7. "[I]dentity may be established through direct or circumstantial evidence." *Id.* "A witness need not physically point out the defendant in the courtroom as long as there is sufficient direct or circumstantial evidence proving that the defendant was the perpetrator." *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 19.

{¶12} Mr. Brown argues that the State did not offer sufficient evidence to establish the element of identity at trial because (1) the BCI report did not establish that he was the perpetrator because it included a probability of his inclusion as a DNA donor of only 1 in 291, (2) the victim could not identify Mr. Brown as the perpetrator, (3) the perpetrator's clothes were never found, (4) no evidence was found during a search of Mr. Brown's home, (5) many people lived near the area where the victim's bank card and checks were found, and (6) there is no video evidence that tied Mr. Brown to the incident or the surrounding area at the time of the incident.

{¶13} The victim testified that she had taken her grandson out for walks several times on the day of the robbery. Around 10:00 A.M., she saw a man on Meade Avenue wearing jeans and a black hoodie. Later, upon returning from an afternoon walk, that same man approached her in her driveway and asked her to either give him a ride to a pawn shop or to call a cab for him. He told her that he was from the Florida-Georgia area. His hoodie covered his hair and ears with only a portion of his face remaining uncovered. He made no eye contact with her and, instead, looked at the ground while speaking to her.

{¶14} He asked her for a drink of water from the hose, but she told him that the hose leaks into the basement and, instead, retrieved a coffee mug of water for him from the house.

When she returned, she noticed the perpetrator was now wearing gloves. He drank from the mug and then set it down on the porch rail.

{¶15} When she asked him what he was going to sell at the pawn shop, he told her cell phones. He then pulled out a gun and told her to put her hands in the air. She testified that all she could focus on was the gun as she was "scared to death." He told her to slowly hand over her cell phone and purse. She complied, but he reiterated, "I said slowly. I'll shoot you." He then instructed her to walk to the front of the house and said, "Don't do anything to draw attention to yourself or I'll shoot you." When she was at the end of the driveway he said, "Now, I want you to turn around. Don't turn back around because if you turn back around I'll shoot you." The perpetrator then ran away.

{¶16} The victim testified that the perpetrator pointed the gun at her the entire time and told her that he would shoot her at least five times. She described the gun as black and similar to a policeman's gun, but not a revolver. She tried to give the police a description of the man, but it was hard because of the way the perpetrator was always staring down and not making eye contact with her. She believed he was about 6'2" tall and guessed his weight at approximately 180 pounds because he was thin.

{¶17} Lieutenant David Whiddon of the Akron police department testified that the victim described the perpetrator as "a black male in his early 20['s], six foot two and between 170, 180 pounds [wearing] a dark-colored[,] hooded sweatshirt and dark-colored [jeans,] * * * [with] a dark-colored backpack." Two days after the robbery, Lieutenant Whiddon received some leads from another officer regarding possible suspects, one of whom was Mr. Brown. Lieutenant Whiddon testified that the BMV listed Mr. Brown as being 23 years old, 6'2" tall,

165 or 170 pounds. The picture of Mr. Brown in the BMV database had been taken the day after the robbery.

{¶18} Akron police officer David Haverstick testified that while on patrol he had seen a man wearing a very dark, navy hoodie, blue jeans, and dark shoes in between Darrow Road and Meade Avenue around 10:30 A.M. on the day of the robbery. He briefly made eye contact with the man. The officer later saw that same man around noon "wearing the same clothes, carrying the same satchel. It was a black like computer-type bag." When he later heard the call regarding the robbery, he believed that the description of the suspect fit the person he had seen twice earlier that day.

{¶19} Officer Haverstick testified that a few days after the robbery he transported Mr. Brown to the police station and recognized him as the person he had seen twice on the day of the robbery. Officer Haverstick and Lieutenant Whiddon both identified Mr. Brown in court. Lieutenant Whiddon testified that when he interviewed Mr. Brown, Mr. Brown told the officer that he was from Florida and just recently came back to Ohio. Mr. Brown also told him his address, which the officer determined to be "within a half mile * * * three-quarters of a mile" from the victim's residence. Mr. Brown provided the police with a buccal swab of his DNA.

{¶20} The victim testified that she was shown a photo array at the police department a couple of days after the robbery. The victim attempted to identify the perpetrator and indicated that the individual in Photo 1 looked like him because of the way he was holding his mouth. But, she told the officer she was not certain with her identification because the suspect "didn't open up [and] was in a hoodie pretty well[-]covered with his face looking down not making eye contact. He was trying to not let me get a good look at him * * *." After a second viewing of

the photo array, she was still not certain, even though Photo 1 "haunted her" because it looked like the individual in the photo had the perpetrator's eyes and mouth.

{¶21} Detective John Bell administered the photo array to the victim and testified that the victim was uncertain and could not make a definite identification. He testified that the victim seemed distressed and was "obviously shaken" while viewing the photo array. Although she said that Photo 1 "haunted her," she was still uncertain. He instructed her to sign the back of a photo if she identified the perpetrator, but she did not sign the back of any of the photos in the array. Mr. Brown's picture was Photo 3 in the array, not Photo 1.

{¶22} A neighbor testified that he found the victim's bank card and checkbook in a grassy area between his apartment complex and the apartment complex next door. The address in the checkbook was only three blocks from his apartment, so he returned the items to the victim. Lieutenant Whiddon testified that after clearing up an initial misunderstanding regarding the neighbor's actual address, he realized the neighbor lived in the apartment complex "right next door" to Mr. Brown.

{¶23} The victim testified that she had never seen the perpetrator prior to that day and there was no other reason for his or anyone else's DNA to be on her coffee mug. Samuel Troyer, a DNA analyst from the Ohio Bureau of Criminal Identification and Investigation, testified that more than one person's DNA was found on the victim's coffee mug. The major DNA profile was consistent with the victim's DNA profile and the minor DNA profile was consistent with Mr. Brown's DNA profile. Mr. Troyer testified that "the chance that a random person in the population to also appear to have their DNA here is 1 in 291 random individuals." He also testified that because two DNA profiles are involved, as opposed to a single source DNA profile, the statistical numbers become much lower.

{¶24} The cumulative evidence, if believed, sufficiently established Mr. Brown's identity as the individual who robbed the victim in this case. The victim could not see the perpetrator's face very well as it was partially covered and he was always looking down. However, the perpetrator told her that he was from the Florida-Georgia area and Mr. Brown told the police that he was from Florida. The perpetrator took a drink from the victim's coffee mug and the Ohio Bureau of Criminal Identification and Investigation only found two DNA profiles on the mug, which belonged to the victim and Mr. Brown. The victim believed the perpetrator was in his early 20's, 6'2" tall, and approximately 170 to 180 pounds. The BMV database listed Mr. Brown as being 23 years old, 6'2" tall, and either 165 or 170 pounds. The victim and Officer Haverstick both saw an individual who matched the description of the perpetrator around the same time in the same area earlier on the day of the robbery. Officer Haverstick made eye contact with the man and later identified him as Mr. Brown. A neighbor found some of the victim's stolen items abandoned in the grass between his apartment complex and Mr. Brown's apartment complex, which are both only a few blocks from the victim's house.

{¶25} After viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Mr. Brown was the individual who robbed the victim in this case.

Operability of the Firearm

{¶26} "In determining whether a firearm is operable, the trier of fact examines the totality of the circumstances." *State v. Johnson*, 9th Dist. Lorain No. 14CA010688, 2016-Ohio-872, ¶ 8. "Proof of the operability of a firearm can be established by circumstantial evidence, which can consist of the brandishing of a firearm by the defendant and an implicit threat to shoot it." *State v. Clayton*, 9th Dist. Summit No. 26910, 2014–Ohio–2165, ¶ 8; *see also* R.C.

2923.11(B)(2). "[W]itness testimony that the defendant was holding a gun while committing a robbery create[s] an implicit threat to shoot and [is] sufficient proof of operability." *Id.* at ¶ 13.

**{¶27}** Mr. Brown argues that the victim could not provide any meaningful evidence that the firearm was real or operable because she only testified that the firearm was black and looked like a policeman's handgun, but she could not describe it sufficiently to show that it was not a replica or a toy or show that it was cocked.

**{¶28}** Even though the firearm was never recovered, the evidence provided by the State, if believed, sufficiently established that the firearm was operable. The victim testified that she could only focus on the gun when it was pointed at her and that she was scared to death. The perpetrator pointed the gun at her the entire time and threatened that he would shoot her at least five times. The victim testified that the gun was black and looked like a policeman's gun, not a revolver.

**{¶29}** After viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that the firearm was operable.

**{¶30}** Mr. Brown's first assignment of error is overruled.

### ASSIGNMENT OF ERROR [TWO]

JEFFERY BROWN'S CONVICTION FOR AGGRAVATED ROBBERY WITH A FIREARM SPECIFICATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

**{¶31}** In his second assignment of error, Mr. Brown argues that his conviction is against the manifest weight of the evidence due to inconclusive evidence. We disagree.

**{¶32}** This Court has stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. "This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction." *State v. Hamilton*, 9th Dist. Lorain No. 15CA010830, 2017-Ohio-230, ¶ 20.

{¶33} Mr. Brown argues that the only evidence presented that established his identity as the perpetrator was the DNA on the coffee mug, but the statistical probability that it came from him was low and there were a large number of people in the area. The statistical probability that someone other than Mr. Brown's DNA was on the coffee mug was 1 in 291, but the DNA analyst testified that the number was lower because two DNA profiles were involved instead of just one.

{¶34} Mr. Brown also argues that the victim's conduct and statements at the photo array hinted more strongly that another individual was the perpetrator. While the victim did not positively identify Mr. Brown in the photo array and instead said that another individual looked like the perpetrator by the way he was holding his mouth, the victim and police officers testified that she was uncertain and still shaken up from the robbery. The jury was not required to believe that the victim's uncertainty demonstrated Mr. Brown's innocence. *See State v. Roberson*, 9th Dist. Lorain No. 10CA009743, 2011-Ohio-988, ¶ 55. The jury was entitled to believe the

victim's explanations that she could not positively identify Mr. Brown because the perpetrator's hoodie partially covered his face, he was always looking down, and she focused solely on the firearm once he drew the weapon, pointed it at her, and repeatedly threatened to shoot her. *See id.*

{¶35} Mr. Brown further argues that no evidence was found inside of his apartment, the perpetrator's clothes were never recovered, and the discovery of the bank card and checkbook outside of his apartment was inconclusive due to the large number of people who lived in the immediate area. But, we cannot say that the absence of evidence inside of Mr. Brown's apartment, the fact that the perpetrator's clothes were never recovered, and the existence of other people living in Mr. Brown's neighborhood outweighs all the other evidence presented at trial. *See id.* at ¶ 56.

{¶36} Finally, Mr. Brown argues that although the victim was scared, the weight of her testimony did not prove the operability of the gun. Although the gun was never recovered, Mr. Brown's actions, as related through the victim's testimony, support the conclusion that the firearm was operable. *See State v. Moton*, 9th Dist. Summit No. 25188, 2011-Ohio-58, ¶ 27.

{¶37} In reviewing the record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, this Court cannot say that the jury lost its way and created a manifest miscarriage of justice in finding that Mr. Brown robbed the victim in this case. "A conviction is not against the manifest weight because the jury chose to credit the State's version of events." *State v. Peasley*, 9th Dist. Summit No. 25062, 2010-Ohio-4333, ¶ 18. This is also not an exceptional case where the evidence presented weighs heavily in favor of the appellant and against conviction.

{¶38} Mr. Brown's second assignment of error is overruled.

III.

**{¶39}** Mr. Brown's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

HENSAL, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

JEREMY A. VEILLETTE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.